IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ANDREA HOLLEY, personal representative
of the Estate of Dustin Van Jelgerhuis, deceased;
JANICE FAY MELCHERT,

    Plaintiffs,

v.                                                                          CIV 12-00320 KBM/WDS

THE EVANGELICAL LUTHERAN GOOD
SAMARITAN SOCIETY, a North Dakota
non-profit corporation, d/b/a GRANTS GOOD
SAMARITAN CENTER,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Motion to Strike Affidavit of Virginia Verity *(Doc. 106)*, filed January 14, 2013.  Pursuant to 28 U.S.C. § 636 and F<small>ED</small>. R. C<small>IV</small>. P. 73, the parties have consented to have me serve as the presiding judge and conduct all proceedings, including trial.  *See Docs. 10, 15, 16.*  Having reviewed the parties' submissions and the relevant law, I find the Motion is well-taken in part, and I will therefore grant the Motion in part.

**I.    BACKGROUND**

Plaintiff Holley is the sister of Dustin Van Jelgerhuis, who died on October 9, 2011 while a resident at Grants Good Samaritan Center.  *See Doc. 33* at ¶¶ 7, 12.  Plaintiff Melchert is Mr. Van Jelgerhuis' mother.  *See id.* at ¶ 8.  Mr. Van Jelgerhuis had been a quadriplegic since July 1, 1989, when he suffered severe head and neck trauma after a hang-gliding accident.  *See Doc. 84* at 1; *Doc. 33* at ¶ 10.  "Due to his condition,

the decedent was incapable of any voluntary movement, apart from coughing and blinking." *Doc. 33* at ¶ 10.

According to Plaintiffs, Mr. Van Jelgerhuis' death was due to Defendant's negligence, including (1) failure to exercise reasonable care to ensure he was positioned properly and "secured in his bed"; (2) negligent hiring and training of employees; (3) failure to take proper precautions for patients at high risk for falls; (4) failure to conduct proper safety checks; and (5) failure to provide and implement a proper care plan. *See Doc. 33* at ¶ 13. Defendant denies any negligence. *See generally Doc. 36*.

On November 29, 2012, Defendant filed a Motion for Summary Judgment, seeking dismissal of Plaintiffs' claims on the grounds that Plaintiffs cannot demonstrate that Defendant breached the standard of care or, even assuming such a breach occurred, that Defendant's alleged breach caused Mr. Van Jelgerhuis' death. *See generally Doc. 84.* Specifically, Defendant contends that Plaintiffs' expert, Virginia Verity, R.N., "was unable to identify any specific fall prevention measure which should have been in place on October 9, 2011" and, further, that Ms. Verity could not identify "any specific fall prevention intervention which would have been effective to prevent Decedent's fall or asphyxiation on October 9, 2011." *Id.* at 5. As support for these purported statements of material fact, Defendants cite to the following deposition testimony by Nurse Verity:

> Q. Just to kind of sum up, you can't identify any specific fall prevention or mitigation measure that you are testifying should have been in place on October 9, 2011, correct?
> A. No.

> Q. And you cannot say that any specific intervention would
> have prevented Dustin's fall or asphyxiation on that date,
> correct?
> A. No.

*Doc. 84-1* at 18.

As part of its Response in opposition to Defendants' Motion *(Doc. 96)*, Plaintiffs provided an affidavit from their expert, Nurse Verity, stating as follows:

> The standard of care governing the response by nursing staff to a patient's fall … does not mandate the specific intervention to be implemented in response to a fall suffered by a patient. Rather, the standard of care requires that the response formulated and implemented be appropriate to the situation, based upon an analysis of the cause of the plaintiff's fall, including consideration of the patient's clinical and cognitive condition the immediate cause of the fall, and other relevant factors. Given the decedent's quadriplegia, his history of involuntary body movement, and the history of falls, **there were modalities available which could reasonably have been expected either to stabilize the decedent in his bed, thereby preventing falls, or alternatively to warn staff in the event of a fall while the decedent was not under direct observation by staff. Appropriate modalities include the use of bed rails for the decedent's bed; the use of trunk wedges or bolsters; the use of a larger bed; or the use of one of a variety of available models of electronic bed alarms.**

*Doc. 96-6* at 2 (emphasis added).[1]

Believing that Nurse Verity's affidavit directly contradicts her deposition testimony without being supported by any new evidence and without clarifying ambiguity or confusion in her deposition testimony, Defendant contends that Nurse Verity's affidavit is a sham and should be stricken from the record in this case. *See generally Doc. 106.* Plaintiffs argue that no contradiction exists between Nurse Verity's original deposition

---

[1] Paragraph 5 of the Affidavit sets forth an incomplete sentence, but this is not discussed by the parties in the briefing.

3

testimony and her subsequent affidavit; thus, the affidavit is properly before the Court. *See generally Doc. 110*.

## II. LEGAL STANDARD

"[C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue" to defeat summary judgment. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). To determine whether an affidavit creates a sham fact issue, the court should consider whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Law Co., Inc. v. Mohawk Constr. And Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009).

However, "[t]o be regarded as a sham, an affidavit must contradict prior sworn statements." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956, n.3 (10th Cir. 2012). *Accord Law*, 577 F.3d at 1169-70 (holding that the trial court committed error constituting an abuse of discretion when it excluded affidavits without identifying how the affidavits conflicted with prior deposition testimony). For instance, an affidavit that provides more examples than the witness provided at her deposition is not contradictory. *See Hernandez* at 965, n.3.

## III. ANALYSIS

In this medical malpractice action, Plaintiffs must show that "(1) the defendant owed the plaintiff a duty recognized by law; (2) the defendant breached the duty by departing from the proper standard of medical practice recognized in the community;

4

and (3) the acts or omissions complained of proximately caused the plaintiff's injuries." *Blauwkamp v. Univ. of N.M. Hosp.*, 836 P.2d 1249, 1252 (N.M. Ct. App. 1992). Proof of these elements generally requires expert testimony, particularly as to the elements of breach of the standard of care and causation. *See id.* at 1253.

Plaintiffs have identified Virginia Shoemaker Verity, R.N. as their expert regarding the applicable standard of care and the Defendant's alleged deviation therefrom. *See Doc. 46* at 2. A different witness, Pathologist Kurt B. Nolte, M.D. of the New Mexico Office of the Medical Investigator, is designated to testify concerning the cause of Mr. Van Jelgerhuis' death. *See id.* Dr. Nolte has not been retained by Plaintiffs. *See id.*

The parties agree that no new material evidence came to light between the time of Nurse Verity's deposition on October 9, 2012 and her December 20, 2012 affidavit. There is also no dispute that Nurse Verity was cross-examined at her deposition. Thus, the critical question for the Court in resolving Defendant's Motion to Strike *(Doc. 106)* is whether any true contradiction exists in Nurse Verity's testimony. *See Law*, 577 F.3d at 1169.

### A. No Conflict Exists in Nurse Verity's Testimony Concerning the Standard of Care or Any Breach Thereof.

Certainly, Nurse Verity declined during her deposition to identify any "specific" fall prevention measure that Defendant should have implemented in order to comply with the standard of care. *See Doc. 84-1* at 18. Although her subsequent affidavit notes "[a]ppropriate modalities" such as bed rails, trunk wedges or bolsters; a larger bed; and an electronic bed alarm, it does not assert that the standard of care requires the use of

5

any of these specific measures.  *See Doc. 96-6* at 2.  Nurse Verity's testimony is therefore consistent concerning the standard of care and alleged breach.

During her deposition, Nurse Verity testified that Defendant "had to try something every time" that Mr. Van Jelgerhuis fell.  *See Doc. 84-1* at 15.  "It may not necessarily be a different thing," she explained, "It may be that they reverted back to something that they had tried two or three falls before, but they—they had to try something every time." *Id.*  Elsewhere in her deposition, Nurse Verity agreed she had not identified interventions Defendant should have instituted at any given time, again explaining, "My opinion [is] that they have to produce something."  *See id.* at 16.  Nurse Verity agreed with Defendant's attorney that if Defendant had instituted some, even *any* new fall prevention measure in response to Mr. Van Jelgerhuis' last fall in 2007, she might well have concluded that Defendant had met the standard of care.  *See id.*

Nurse Verity also discussed each of the modalities identified in her affidavit during the course of her earlier deposition.  With respect to the use of side rails, Nurse Verity declined to opine definitively that Defendant should have implemented side rails. *See Doc. 106-1* at 2.  Instead, she testified, "I don't know what progression they might have gotten to with their falls management as they worked through those seven falls.  It could have been possible that as—as a result of their analysis, they may have decided to try the side rails again."  *Id.*  Nurse Verity explained further, "I think they should have assessed him on whether they should have thought about putting a rail back again or not or doing—when they were trying to figure out what they should do with his falls.  That could have been one of the options that they could have explored."  *Id.* at 4.  In general, Nurse Verity testified, "[T]here should have been something in place from the—

from the seventh fall. I'm not saying it would have been a side rail. I don't know what. It could have been a larger bed, it could have been an alarm." *Id.* at 4-5. In the same context, Nurse Verity references a bolster as a possibly appropriate fall prevention measure in this case. *See id.* at 5.

Nurse Verity's affidavit does not conflict with the above-referenced testimony. The affidavit states, consistent with her deposition testimony, that

> [t]he standard of care governing the response by nursing staff to a patient's fall . . . does not mandate the specific intervention to be implemented in response to a fall by a patient. Rather, the standard of care requires that the response formulated and implemented be appropriate to the situation, based upon an analysis of the cause of the plaintiff's fall, including consideration of the patient's clinical and cognitive condition, the immediate cause of the fall, and other relevant factors.

*Doc. 96-6* at 2. Her identification of specific measures—bed rails, trunk wedges or bolsters, a larger bed, and an electronic bed alarm—as possible steps to have considered in response to a fall— does not contradict her deposition testimony. *See id.* It might have been more appropriate for Nurse Verity to characterize these modalities as "possibly appropriate" rather than merely "appropriate," but her characterization follows the explicit statement that "[t]he standard of care . . . does not mandate the specific intervention to be implemented in response to a fall suffered by a patient." As such, no clear conflict exists between the deposition and the affidavit, and the Court will not strike Nurse Verity's December 20, 2012 affidavit insofar as it references the standard of care and/or any breach thereof.

Defendant argues that Nurse Verity "explicitly testified that she did not engage in the type of analysis necessary to determine what could have been implemented as a

7

part of Decedent's care," noting her admission in her deposition that she was not intending to provide fall management options "after the fact." *Doc. 116* at 4 (referencing *Doc. 82-1* at 8-9). To whatever extent this may be true, it could provide effective cross-examination material, but it is not the kind of direct contradiction that necessarily suggests an effort to create a sham fact issue. *See Franks*, 796 F.2d at 1237 (noting that not all conflicts may be disregarded; rather, the court must conclude the conflict is an attempt to create a sham fact issue). Nurse Verity mentioned all of the methods raised in her affidavit during the course of her deposition and consistently declined to assert that any of them would have prevented Mr. Van Jelgerhuis' continued falls. The Court will not strike Nurse Verity's affidavit regarding the standard of care and/or breach thereof.

### B. Conflicts Exist in Nurse Verity's Testimony Concerning Causation, Which Require Portions of Her Affidavit To Be Stricken.

Plaintiffs and Defendant agree in this case that Nurse Verity's opinions are confined to the standard of care applicable to Mr. Van Jelgerhuis and any breach thereof. Nurse Verity testified unambiguously in her deposition that she was not qualified to offer an opinion as to what caused Mr. Van Jelgerhuis to fall out of his bed on October 9, 2011. *See Doc. 84-1* at 19. Moreover, Plaintiffs do not dispute that Nurse Verity "is not qualified to offer any opinion as to what caused the Decedent to leave his bed on October 9, 2011, or what caused his death." *Doc. 84* at 5, ¶ 22; *Doc. 97-1* (failing to include any dispute regarding causation, other than to reference Mr. Van Jelgerhuis' death certificate, which lists positional asphyxia as cause of death).

Beyond her qualifications, Nurse Verity testified in her deposition that she could not say that any specific intervention would have prevented Mr. Van Jelgerhuis' fall or

8

asphyxiation. *See Doc. 84-1* at 18. Elsewhere in her deposition, Nurse Verity agreed with Defendant's attorney that she "[did]n't know what result there would have been with a particular kind of intervention and how it would have gone." *Doc. 106-1* at 2. With regard to side rails in particular, Nurse Verity testified that she did not know whether they would have been effective to prevent Mr. Van Jelgerhuis' fall on October 9, 2011. *See id.* at 3. With regard to a larger bed, Nurse Verity admitted that she could not say whether this intervention would have kept Mr. Van Jelgerhuis safe from falls and/or asphyxiation. *See id.* at 7 In fact, Nurse Verity acknowledged that a larger bed itself posed a potential risk of asphyxiation. *See id.* at 6. Likewise, Nurse Verity agreed that the use of a trunk wedge or bolster posed a similar risk of asphyxiation. *See id.* at 8.

In her more recent affidavit, however, Nurse Verity testified that at least four fall intervention measures "could reasonably have been expected either to stabilize the decedent in his bed, thereby preventing falls, or alternatively to warn staff of a fall while the decedent was not under direct observation by staff." *Doc. 96-6* at 2. According to Plaintiffs, Ms. Verity's affidavit does not assert "that the use of a specific fall safety measure would definitively have prevented [Mr. Van Jelgerhuis'] fatal fall." *Id.* Defendant contends that even if Nurse Verity's affidavit does not directly contradict her earlier testimony,

> it is proffered in order to create an implication that *is* directly contrary to Ms. Verity's deposition testimony in this case: i.e., that notwithstanding her repeated inability to identify any intervention which could and should have been in place in October, 2011, and which would have prevented Decedent's fall or death, she nonetheless intends to advise the jury there were some such interventions.

*Doc. 106* at 5.

9

The Court finds Nurse Verity's affidavit directly contradictory to her earlier deposition testimony with respect to causation. Her affidavit states that at least four fall intervention measures "could reasonably have been expected" to prevent Mr. Van Jelgerhuis' fall or warn staff more timely that it had occurred. This is contrary to her deposition testimony, wherein Nurse Verity acknowledges she cannot testify that any specific measure would have prevented Mr. Van Jelgerhuis' fall. Moreover, although Defendant has not raised this concern in the instant Motion, Plaintiffs have not designated Nurse Verity to opine about causation, and Plaintiffs and Nurse Verity herself have unequivocally indicated that Nurse Verity is not qualified to opine about causation. Regardless, a clear conflict exists between Nurse Verity's deposition and her affidavit as to whether any fall prevention measure would have, to a reasonable degree of medical probability, prevented Mr. Van Jelgerhuis' death. The Court will therefore strike the last portion of Paragraph 8 of Nurse Verity's affidavit.

## IX. CONCLUSION

Plaintiffs' standard-of-care expert, Virginia Shoemaker Verity, R.N., has offered testimony that contradicts her prior sworn statements. No new evidence exists to explain the contradictions concerning causation.

**Wherefore,**

**IT IS HEREBY ORDERED** that the December 20, 2012 Affidavit of Virginia Verity, R.N. *(Doc. 96-6)* be stricken in part. Specifically, the Court hereby strikes the third sentence of Paragraph 8, which presently begins, "Given the decedent's quadriplegia, . . ." The fourth sentence of Paragraph 8 may remain intact, with the

addition of the word "Potentially" at the beginning of the sentence. In its entirety, Paragraph 8, as amended by this Order, should read as follows:

> The standard of care governing the response by nursing staff to a patient's fall, as stated in Paragraph 2 above, does not mandate the specific intervention to be implemented in response to a fall suffered by a patient. Rather, the standard of care requires that the response formulated and implemented be appropriate to the situation, based upon an analysis of the cause of the plaintiff's fall, including consideration of the patient's clinical and cognitive condition, the immediate cause of the fall, and other relevant factors. Potentially appropriate modalities include the use of bed rails for the decedent's bed; the use of trunk wedges or bolsters; the use of a larger bed; or the use of one of a variety of available models of electronic bed fall alarms.

**IT IS SO ORDERED.**

_____
UNITED STATES CHIEF MAGISTRATE JUDGE